### MARLENE LINENS v. BOWLES, Price Adm'r.

### No. 148.

United States Emergency Court of Appeals. Heard at New York Sept. 6, 1944. Decided Sept. 29, 1944.

S. A. Hauptman, of Brooklyn, N.Y. (Hauptman & Hauptman, of Brooklyn, N. Y., on the brief), for complainant.

Nathaniel L. Nathanson, Associate Gen. Counsel, with whom Richard H. Field, Gen. Counsel, Jacob D. Hyman, Chief, Court Review Price Branch, Lester N. Salwin and Samuel M. Singer, all of the Office of Price Administration, all of Washington, D. C., were on the brief, for respondent.

Before MARIS, Chief Judge, and MAGRUDER, Judge.

MARIS, Chief Judge.

The complainant entered business January 1, 1943, as a processing wholesaler of printed cotton towels, toweling, tablecloths and napkins. It purchases gray cotton goods from independent producers. The complainant then contracts to have the gray goods bleached, printed and washed by independent contractors. Some of the goods are printed in single unit designs or patterns with appropriate blank spaces between the units to allow for eventual cutting into individual tablecloths. The complainant arranges for the cutting of the goods so as to follow the original plan of single unit designs or patterns. Each unit is then hemmed into an individual tablecloth. At vaious times during 1943, due to labor shortages, cutting and hemming facilities were not available. In some instances, therefore, the complainant omitted the last two steps and sold the goods to the retailer uncut, in bolts containing multiple units of the single design or pattern. In such instances the complainant allowed the purchasers a small price differential equivalent to the cost of cutting and hemming.

The complainant's practice of selling fabrics printed in tablecoth design in bolts rather than cut and hemmed arose in 1943 after the issuance of Maximum Price Regulation No. 127.[1] That Regulation, establishing maximum prices for finished piece goods, was issued April 27, 1942. Until January, 1944, however, the complainant sold its fabrics, whether in bolts or cut and hemmed into individual tablecloths, at the prices established by the General Maximum Price Regulation which had governed the sale of its finished tablecloths. On January 31, 1944, in response to the complainant's inquiry addressed to the Office of Price Administration the New York Regional Office issued a letter of official interpretation declaring that prices for fabrics printed in tablecloth designs, when uncut and sold in bolts, were governed by Maximum Price Regulation No. 127.

The complainant filed a protest with the Office of Price Administration on April 7, 1944. The protest was dismissed by the Administrator on May 18, 1944 on the dual grounds that it was not filed within the time provided for by the statute and that it did not state any objection to a provision of Maximum Price Regulation No. 127. The complainant thereupon filed this complaint.

The primary contention of the complainant is that the interpretation placed upon the Regulation by the Administrator's New York Regional Office was wrong. The Administrator urges that this is the sole issue which the complainant seeks to raise and that in the absence of an attack upon the validity of the Regulation such a question is not cognizable in this court. He suggests that in an appropriate court the complainant may obtain a declaratory judgment as to the interpretation and applicability of the Regulation. He also suggests that in enforcement proceedings against it for an alleged violation of the Regulation, the complainant may defend on the ground that the Administrator's interpretation is erroneous and that the Regulation is inapplicable to it. We agree that if the complaint merely sought an interpretation of the Regulation, without in any way attacking its validity, it would not be cognizable by this court. We think that in the present case, however, both the protest and the complaint, while not expressed with precision and clarity, do contain an attack upon the validity of Maximum Price Regulation No. 127.

It is true that the complainant does not contend that the maximum prices established by Maximum Price Regulation No. 127 are unfair or inequitable when applied to the industry of which it is a member or that they fail to conform to the standards of the Act. It does, however, take the position that the Regulation, which deals with finished piece goods, if interpreted as ap-

[1] 7 F.R. 3119.

plicable to its tablecloth commodity, is invalid as arbitrary and capricious.

Section 1400.81(2) of Maximum Price Regulation No. 127 defines finished piece goods as "woven fabrics, more than 12 inches in width, bleached, dyed, printed, mercerized or otherwise finished or processed, composed—in the amount of seventy-five per cent or more by weight—of either cotton fibre or chemically produced yarn or fibre made from cellulose or with a cellulose base, or of any mixtures thereof."

The complainant admits, as indeed it must, that taken literally this definition includes its commodity. It argues that this is not decisive of the question. Pointing out that the Administrator by Section 1400.78 of the Regulation has expressly exempted from its scope a large number of commodities which, although within the definition contained in the Regulation, are not regarded in the trade as "finished piece goods" the complainant urges that its uncut bolts of tablecloths should also have been exempted since they also are not commonly regarded as "finished piece goods," being processed by bleachers and printers as tablecloths, launched by the complainant upon the market as tablecolths, and purchased by retailers and consumers as tablecloths. The complainant contends that the Administrator's failure to do so renders the Regulation arbitrary and discriminatory as to it. It will be seen that the question thus presented is not solely one of interpretation, as urged by the Administrator, but is an attack upon the validity of the Regulation itself interpreted as it has been, and we think reasonably, by the Administrator.

The Administrator has the duty to establish maximum prices for any commodity, if in his judgment it is necessary to do so to effectuate the purposes of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 901 et seq. He may establish such maximum prices in a regulation dealing with but one commodity or may establish maximum prices in a single regulation dealing with many diverse commodities.

See, for example, the General Maximum Price Regulation which was upheld by this court in Philadelphia Coke Co. v. Bowles, Em.App., 139 F.2d 349. This is a matter of form and draftsmanship which Congress has left to the discretion of the Administrator. In the event that the Administrator chooses to include a number of distinct commodities within a single regulation he may do so in either of two ways. He may describe and define each commodity separately in the regulation or he may, as he did in Maximum Price Regulation No. 127, define so broadly the single commodity which the regulation purports to regulate that the definition will include within its terms all the distinct commodities sought to be covered. The only limitation upon him in this connection is that the regulation must be generally fair and equitable with respect to each commodity regulated and must conform to all other standards laid down by the Act. His definition need not necessarily be one which conforms to common usage, or to dictionary precision, or to the understanding of the trade.[2] While such a departure from ordinary usage is frequently undesirable as tending to confusion rather than clarity and as thus setting a trap for the unwary,[3] it does not render a statute or regulation invalid. On the contrary it is settled that a statutory definition of a term used therein supersedes the commonly accepted meaning of the term. Fox v. Standard Oil Co., 1935, 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780. The same rule has been applied to an administrative regulation issued under statutory authority. Pearson v. Walling, 8 Cir., 1943, 138 F.2d 655, certiorari denied 321 U.S. 775, 64 S.Ct. 616.

The Administrator dismissed the protest because not timely filed and urges that the complaint should be dismissed for the same reason. In view of the lack of any real ambiguity in the Regulation it may well be questioned whether the interpretation made by the New York Regional Office afforded the complainant new grounds of protest which rendered its protest timely. See Galban Lobo Co. v. Henderson, Em.App.

[2] An illustration of this may be found in the Emergency Price Control Act itself, Section 302(c) of which defines "commodity" to include certain personal services. This court gave full effect to this definition in Lincoln Sav. Bank of Brooklyn v. Brown, 137 F.2d 228.

[3] "It has been very much doubted, and I concur in that doubt, whether these interpretation clauses, which are of modern origin, have not introduced more mischief than they have avoided; for they have attempted to put a general construction on words which do not admit of such a construction in the different senses in which they are introduced in the various parts of an Act of Parliament." Lord Chancellor St. Leonards in Dean of Ely v. Bliss, 2 De G. M. & G. 459, 471 (1852), 42 Eng.Repr. 950, 955.

1942, 132 F.2d 150, certiorari denied 318 U.S. 756, 63 S.Ct. 530, 87 L.Ed. 1130; United States Gypsum Co. v. Brown, Em. App. 1943, 137 F.2d 803, certiorari denied 320 U.S. 799, 64 S.Ct. 427. Since subsequently to the filing of complainant's protest Congress struck out of the Act[4] all time limitations upon the filing of protests we have thought it best to resolve all doubt on this score in favor of the complainant and to dispose of its contentions upon the merits.

A judgment will be entered dismissing the complaint.

[4] By Section 106 of the Stabilization Extension Act of 1944, amending Section 203(a) of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 923(a).